Tiffany J. Dowling, Actual Innocence Clinic, The University of Texas at Austin School of Law, 727 East Dean Keeton St., Austin, TX 78705, KUSSMAUL ATTORNEYS FOR APPLICANT
Sterling Harmon, Appellate Division Chief, 219 North 6th Street, Suite 200, Waco, Texas 76701, KUSSMAUL, PITTS and SHELTON ATTORNEYS FOR THE STATE, STACEY SOULE, STATE'S ATTORNEY, AUSTIN
John J. McKetta, III, William Christian, Graves Dougherty Hearon & Moody, 401 Congress Ave., Suite 2200, Austin, Texas 78701, LONG ATTORNEYS FOR APPLICANT
Sterling Harmon, Appellate Division Chief, 219 North 6th Street, Suite 200, Waco, Texas 76701, LONG ATTORNEYS FOR THE STATE
Ryan C. Myers, Jeffery B. Vaden, Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002, PITTS ATTORNEYS FOR APPLICANT
Newell, J., delivered the unanimous opinion of the Court.
Applicants James Edward Long, James Wayne Pitts, Jr., and Michael DeWayne Shelton pleaded guilty to the offense of sexual assault and testified against Applicant Richard Bryan Kussmaul at his capital murder trial. Long, Pitts, and Shelton all testified at trial that they and Kussmaul had gang raped a female victim, and that Kussmaul had shot both the female and male victims. Post-conviction DNA test results *610 exclude all four men as contributors to the semen collected from the crime scene, but reveal the genetic profiles of two unidentified men. Long, Pitts, and Shelton now recant their inculpatory statements to the police and their testimony at Kussmaul's trial, and the trial court recommends that we grant relief on Article 11.073 and actual innocence grounds. We agree that they are entitled to relief under Article 11.073 based on the discovery of new scientific evidence, but disagree that they have proven they are actually innocent.[1]
I. Background
A. The Crime
The facts of the crime were set out by the court of appeals on direct appeal of Kussmaul's conviction.
The testimony [from the accomplices] reveals that Pitts received a telephone call from Leslie Murphy, stating that she and Pitts's former girlfriend were in San Antonio and would be coming through Bruceville-Eddy that afternoon and wanted to meet with him. Pitts agreed to meet them outside a movie rental shop in Eddy. Pitts did not have transportation, so he called Kussmaul to pick him up. While waiting for Leslie Murphy to arrive, Pitts and Kussmaul went to the Frontier Lounge for an hour or two. They then went to the movie rental store where they picked up Leslie Murphy and her companion, Steven Neighbors. Pitts' former girlfriend was not with them. They all then rode in Kussmaul's pickup to a mobile home in a rural area near Moody. On their way they picked up another friend of Kussmaul's, James Long. Kussmaul lived at the mobile home with Michael Shelton and two girls. The two girls, however, were not present during any of the events that happened at the mobile home that evening. Michael Shelton was at the mobile home when Kussmaul left to pick up Pitts and was still there when the group returned.
They only stayed at the mobile home a short period of time while they loaded up an ice chest with beer and left for Poor Boys, a nightclub in Eddy. They stayed at Poor Boys until nearly closing time and shot pool. All were drinking beer except Pitts and the victims, who were all underage. There was also some evidence that Kussmaul went outside Poor Boys at one point in the evening and smoked some marijuana. From Poor Boys they all rode back to the mobile home in Kussmaul's pickup truck. Shelton and others were still drinking beer, which was being passed from the coolers in the pickup bed through the rear sliding-glass window to those in the passenger cab. Shelton admitted to drinking 18 to 20 beers during the course of the evening.
After being at the mobile home a short while, the accomplice testimony is that Kussmaul began "harassing" and making "sexual advances" on Leslie Murphy by placing his hands on her breasts and between her legs. Murphy *611 apparently tried to discourage Kussmaul verbally and ultimately slapped him on his face. Kussmaul then hit her in the face with his fist, knocking her to the floor. Kussmaul then "hollered" at Pitts, Long, and Shelton to hold Murphy down while he took his lock-blade knife from the holster on his belt and cut the crotch out of her jeans and panties. According to the testimony, Leslie Murphy was screaming for help during this time. Kussmaul began raping her on the carpeted living room floor, but apparently due to her continued resistance, he and the accomplices forcibly carried her into the bedroom where she was "thrown" onto a bed which had a flowery yellow sheet on it. Prior to carrying Murphy into the bedroom, James Long hit Steven Neighbors in the face with his fist and knocked him "almost unconscious" on the floor. Pitts was trying to hold Murphy down on the bed, but she looked up and Kussmaul hit her in the face again and tied a "gag" around her head and over her mouth. After that, she was described as "not moving much," and Kussmaul then raped her and left the bedroom. Long, Shelton, and Pitts then raped Murphy, during which occurrence a gunshot was heard from outside. Kussmaul returned to the bedroom with a rifle. Neighbors was dragged from the living room into the bedroom where Kussmaul kicked him in the face and he fell to the floor. Kussmaul then stated he was going to "kill the fucking bitch" and shot her once in the back. He then turned the rifle toward Neighbors and stated that he was "going to kill him, too" and shot him in the back, also.
Kussmaul, Shelton, Long, and Pitts then wrapped the victims in sheets and placed them in the back of Kussmaul's truck. They drove around for awhile and eventually dumped the bodies beside a gravel road. They returned back to the mobile home and cleaned up the blood and vacuumed the floors. During the cleaning, Kussmaul was still in possession of the rifle, which was described as being bolt-action.[2]
B. The Corroborating Evidence
As was recognized by the court of appeals on Kussmaul's direct appeal, there was evidence that corroborated portions of Long, Pitts, and Shelton's pre-trial statements and the consistent parts of their trial testimony.[3]
1. Claudine McNamara's Testimony That She Saw Applicants with the Victims at Poor Boys
Claudine McNamara, the waitress at Poor Boys, testified to seeing the victims and the co-defendants together at the club the night of the murders. She testified she knew Kussmaul-that he actually lived with her for a few months. She said he showed up at Poor Boys on March 20, 1992, with James Long and two others Kussmaul "ran around" with-along with two teenagers she did not know, a boy and a girl. She identified them as the two murder victims.
Q What in particular helped you identify the young boy?
A His features, the earrings for one thing in his ears. It was unusual for someone to come in that area with that kind of dress code.
Asked how, questioned a year later, she was able to remember that the group came in on March 20th, she said it was because it was a couple of weeks before the bar closed-and they'd had a pool tournament *612 that night to help sell off their stock. She said she had seen the pictures of the missing teens on a flyer at the convenience store she frequented, and recognized them, but never put it together where she had seen them until she was questioned in 1993.
All three men testified that they went to Poor Boys to play pool and drink beer, and Long and Shelton specifically talked about seeing McNamara. When Long was asked whether he had seen anyone he knew at the bar that night, he replied, "Claudine McNamara." Shelton, asked the same question, replied
A Yeah. I forgot her name now, she was a bartender. Bryan used to run around with her boyfriend. I already forgot her name.
Q Is her name Claudine?
A Yeah. Claudine McNamara.
Pitts said they "shot some pool, drank" and then left together in Kussmaul's truck.
2. Trace Evidence-Trailer Carpet Fibers on the Sheet and Blanket the Bodies Were Found Wrapped In
SWIFS trace evidence analyst Charles Linch testified that carpet fibers found on a sheet and blanket the bodies were wrapped in matched the carpet in the trailer bedroom.
Q Now, did you compare those fibers that you found on either the blanket or the bed sheets with the fibers from the carpet sample that Deputy Davis stated that he seized from the trailer here?
A Yes, sir, I did.
Q And would you tell the jury how that was done and what the result of your comparison was?
A There was one fiber from the white bed sheet that I could not exclude as coming from the master bedroom of the mobile home trailer. There was one trilobal fiber from the pink blanket that I could not exclude as coming from the bedroom of the mobile home trailer.
Q And when you say that you cannot exclude the fiber, what do you mean by that, Mr. Linch?
A That means in going through my steps of comparison with the comparison light microscope, the polarized light microscope, the fluorescence microscope and micro spectrophotometer, no differences at all were seen. That means that the fibers found with the bedding with the bodies either came from the carpet in the mobile trailer or carpet that is identical to that in the mobile trailer.
He could "tell no differences" between fibers from the carpet sample and the carpet fibers that were recovered from the blanket and the bed sheet. The defense expert, Patricia Eddings, a Senior Trace Analyst from the Tarrant County Crime Lab, testified that she examined the microscopic slides that had been prepared from evidence in the case and reviewed Linch's reports. She said she, too, could not exclude the fibers from the blanket and sheet as having come from the carpet.
Linch also testified about a bullet hole in the blanket that had "the characteristics of a bullet exit from a body." In looking for unburned gunpowder particles he came across scattered lead and a fragment of bone. All three men testified about this blanket-they said it came from Kussmaul's truck. Long testified that "[a] blanket that was in the bed of Mr. Kussmaul's pickup" is what they put under the bodies in the pickup. Pitts identified the blanket that was found with the bodies as having been in "the back of Bryan Kussmaul's truck." Shelton said "[t]hat blanket, it was in underneath the tool box that was thrown down."
*613 3. Sergeant Turnbow's Testimony That Shelton Led Him to Where the Bodies Had Been Found
McLennan County Sheriff's Department Sergeant Ronnie Turnbow testified that, on April 20, 1993, he and Shelton drove out to the mobile home on Tower Road. Shelton showed him around.
A Then we got back in my vehicle and we drove a route out of the trailer driveway. We took a right, we turned right again on Winchester Road. We got to this intersection (indicating), we turned right on Mackie Road, then we turned right on Hodge Road and followed it around to this location here (indicating).
Q What was the purpose of this trip?
A He was showing me the route that had been driven the night that these bodies were placed in the ditch.
Q Okay. Did he also show you where the bodies were dumped?
A As we got close, he indicated that was the area.
This corroborated Shelton's own testimony.
Q All right. Did you ever take one of the McLennan County Sheriff's Office Deputies out to the scene where the bodies were dumped?
A Yes, sir, I did.
Q Take him right to the spot?
A Exactly the way we took them.
* * *
Q Okay. You knew where they were found. I mean, everybody knew where they were found, didn't they?
A Well, I knew where they was because we were the ones that dumped them off.
4. The Bolt Action Rifle and Shots to the Back
Dr. Janice Parchman, a SWIFS forensic pathologist, recovered bullet fragments from both victims during autopsies. Lannie Emmanuel, a Dallas County firearm and tool mark examiner, testified that the fragments came from "British .303 Mark 7" bullets. Emmanuel used the class characteristics ("two lands and grooves with a left twist") to identify what particular firearms could have been used to fire the bullets and there was only one weapon that came up: "a .303 British Lee Enfield" bolt-action rifle. This corroborates Long's testimony that the firearm Kussmaul used was a "bolt action rifle," and Shelton's testimony that the rifle wasn't the .22 or .410 that he had seen at the mobile home before. Dr. Parchman testified that both victims had been shot once, and in the back. Long testified Kussmaul "shot her in the back." "We all had words with him, why he killed the girl, and he said that he was going to kill the boy, too. And when he-he turned with the gun towards the boy, and I jumped backwards and I run into Mr. Pitts, and that's when he shot the boy." Shelton testified that Murphy lay kind of twisted on the bed and she "was shot in the back ... that was it, one shot, and then nothing from her." Shelton wasn't sure where Neighbors was shot; "The boy was-I'm not exactly sure because I didn't see much, but the feet-because there was a dresser in the way."
5. The Transmission Fluid, Kussmaul's Truck, and the Neighbors' Testimony
McLennan County Deputy Sheriff Larry Abner testified about going out to the crime scene on March 21, 1992, and some tire tracks that were found that suggested that the vehicle that was used to dump the bodies had been backed into the spot and then the driver had spun its tires in the grass leaving. There were oily droppings that followed those tracks.
*614 There appeared to be some type of oil or transmission fluid droppings that appeared to have come from the vehicle that left these tracks in relation to where it was parked in the direction of the tracks. And these drops continued this way (indicating). Approximately every 15 to 17 steps was another drop of either oil or transmission fluid.
They followed the spots for three or four miles up to the paved road which was so traveled on there were spots everywhere. "So we couldn't tell which direction they went from there." Lieutenant Sheriff Truman Simons testified that he had worked as a mechanic and he identified the liquid as transmission fluid.
Mike Avila, a neighbor living near the trailer, testified that around 1 a.m., on the night before the bodies were found, he heard a truck, one he had seen and heard before, pull up ("a Chevrolet ...like gray or tan"). Ten minutes later he heard a gunshot, and heard "a girl or a woman" calling for help. A half hour later he heard two more gunshots, very close together. Ten or fifteen minutes later he heard the pickup leave-towards Tower Road. He recognized the truck "[b]y the loud exhaust pipes it had up there, loud pipes." He had heard that truck "[s]everal times before," but he never heard it again after that night. Avila said he talked to his neighbor, James Phelps, Sr., about it the next morning, but never told authorities.
Q Mr. Avilla, let me ask you a question. How come you didn't contact somebody in regard to this?
A Well, I was afraid of getting hurt.
James Phelps, Sr. testified he heard a single gunshot around 11:00 p.m. that night and confirmed the conversation with Avilla that next morning.
All this testimony matched up with the testifying Applicants' testimony that they used Kussmaul's truck that night and their descriptions of that truck. Long testified that Kussmaul drove a "Chevrolet pickup ... loud exhausts on it, had a tool box on it, and it was brown." Pitts testified the exhaust on the truck was "loud" and that the truck leaked transmission fluid. Shelton testified the truck had "loud pipes on it." He also said that he saw Kussmaul checking the oil on his truck that day. And Avilla's time-line roughly coincides with the order of events the men testified to.
6. The Cut Outs on Murphy's Jeans and Underwear-and the Gag
McLennan County Deputy Sheriff Scott Gates testified about the clothing-cut out at the crotch-and the gag tied around the mouth of Murphy. Photographs were introduced into evidence which showed the crotch had been cut out of Murphy's jeans and underwear. Again, the three men testified about this. Long testified, "we had her on [the] floor and then Bryan pulled his [knife] out, and that's when he cut her pants." He pulled the knife from "his pouch on the side, belt side." After cutting the crotch out of her panties "[h]e closed it up and put it back in his pocket." Kussmaul put a gag in her mouth because "she was screaming." Long had retrieved it from the kitchen. Pitts too testified about the cutting: "Mr. Kussmaul pulled out his pocket knife and opened it on his leg." He then "proceeded to cut the crotch out of Leslie Murphy's pants" and then her "underwear." And later "they had put a gag on her mouth." Shelton said that "Bryan pulled a knife out on the side of his belt in a holster ... It was a lock blade ... I seen he cut the crotch out of her pants." And "Bryan hit her again and put a gag in her mouth."
7. Kussmaul's Admission to a Jailhouse Informant
Richard Chaney testified that while he was in jail with Kussmaul, Kussmaul told *615 him about the killings. Kussmaul said he used a rifle, which he had gotten rid of in Denton. Chaney's testimony is itself short, and short on details. But unlike most jailhouse informants, Chaney knew Kussmaul before he talked to him in jail. Kussmaul had given Chaney a ride before, and also had run into him at a gas station.
C. The Investigation and Pleas and Trial
Investigation showed that, on March 18, 1992, seventeen-year-old Murphy and fourteen-year-old Neighbors had hitchhiked, with a third teen, from Dallas to Waco, where they spent the night with Murphy's ex-boyfriend, Jonathan Krebbs.[4] The threesome hitchhiked to San Antonio the next day, and on Friday March 20th, Murphy and Neighbors hitchhiked back north on I-35. Early on March 21st, their bodies were found beside a gravel road near Moody, Texas-some twenty-five miles from Waco. Deputy Abner was assigned the case. Krebbs was questioned, but denied seeing the victims on their return through Waco. Pitts, an acquaintance of Murphy's who lived in Moody, was also questioned, but he maintained he had only met Murphy once in Dallas and had not spoken to her in a long while. Both men were cleared as suspects. Kussmaul got a call from Abner in May of 1992. Kussmaul said he did not know the pair, or who may have killed them, and that he was at his ex-girlfriend Kendra's trailer in rural Moody on the night in question. Dep. Abner spoke to Kendra and her sister and they told Abner that Kussmaul was with them on Friday, March 20, 1992, and Saturday, March 21, 1992. Kendra also said that Kussmaul had recently broken up with her and "she would not try to cover for him or furnish him an alibi unless it was true." Despite a publicized reward for information, no one in 1992 reported seeing the two victims on the night of the murder. No weapon was found. The investigation went cold. In March 1993, Kendra gave a corrected statement-saying that Kussmaul and Shelton went to the Melody Ranch that Friday night and that she was at home and that Kussmaul came in sometime after 2:00 a.m.
In April 1993, McLennan County Deputy Sheriff Roy Davis was assigned the case, and his first step was to talk to the previously-cleared Pitts. He keyed in on Pitts because Pitts was the first man connected to Murphy and Neighbors that he came across in the case files.
A I was talking to Mr. Pitts and I had no evidence on him at all ... I do a deal I call "go fishing." I just threw it out there. I said, Why do I have witnesses that can put y'all together in McLennan County when the last time she was alive or they was alive was in San Antone? At that time, he just lost it and started making up excuses and telling me how he happened to be with them in the Moody area.
Q So then he put himself at or near the time of the murders with the victims; is that right?
A That is correct.
In this way Pitts "cracked the case" for Davis. Over four days (March 29-April 1, 1993), Pitts gave five statements (two written and three tape-recorded). After Pitts had provided a statement, Davis would investigate Pitts' account. When investigation revealed inconsistencies, Davis would ask Pitts to explain the inconsistencies. Pitts would then reveal more or change his story to account for the inconsistencies. He *616 would give a "little bit more each time." Eventually, Pitts confessed to participation in the crime, connected Kussmaul, Long, and Shelton to it, and named Kussmaul as the shooter. He was able to give details of where the bodies had been dumped. Davis contacted and obtained confessions from Shelton and, nearly a year later, on April 5, 1994, from Long. The State offered plea bargains to Long, Pitts, and Shelton: 10 years of probation in exchange for pleading guilty to sexual assault and testifying against Kussmaul. All three accepted the offer.
In April 1994, Long entered a plea of guilty before the Hon. George Allen. Pitts and Shelton entered pleas of guilty before the Hon. Raymond Mormino. Kussmaul's capital murder case went to trial in May 1994, with Judge Allen presiding. As discussed above, Long, Pitts, and Shelton all testified that they and Kussmaul had gang raped Murphy, and that Kussmaul had shot both Murphy and Neighbors. The only testimony about DNA that the jurors heard was this from Charles Linch.
Q Now, you checked the blanket and the bed sheet for seminal fluid and didn't find any, is that correct, or were unable to detect any, is that correct?
A That's right.
Q What would-if any were on either of the items, had ever been on them, what would be a reason for not being able to find any?
A If the seminal fluid were mixed in the blood, you would not see it or detect it chemically.
* * *
Q Is it possible to do a DNA examination on seminal fluid if there are no sperm present?
A In order to extract DNA from material, you must have a cell with a nucleus. The spermatozoa have a very packed nucleus with a lot of DNA. If you have seminal fluid with no spermatozoa, you will not retrieve any DNA of any quality. However, in the process of ejaculation there may be some urethral cells come off in the ejaculate that have nuclei. Now, the advanced PCR amplification techniques, you may be able to pick up the epithelia DNA from the male. But I haven't heard of many labs having success doing that. So, to answer your question with regard to seminal fluid and the absence of sperm, it would be unlikely to recover DNA.
* * *
Q You indicated that the absence of sperm would-you wouldn't be able to do any kind of DNA analysis if there wasn't sperm present in a semen sample. Is that essentially what you said?
A I said with regard to the RFLP technique, which requires quantity-quality material, you would not recover any DNA if any sperm were not present. With the PCR amplification that we do not currently do, you may recover DNA from the male epithelia cells in an ejaculate or seminal material.
Q So there's one type of DNA analysis, the PCR, that you would be able to get some kind of test results out of?
A You might try it, but you can't guarantee that the material would amplify.
Q Okay. If it did or if somebody tested it and they were able to get a result, there would be-that means there is enough there to test, basically, is that right?
A Could you rephrase?
Q Okay. It's possible for there even-if there is no semen or no sperm, for you to do the PCR analysis and obtain a result?
*617 A Under ideal circumstances, yes, sir.
The jury found Kussmaul guilty and his punishment was automatically assessed at life.
After hearing Long, Pitts, and Shelton's trial testimony about their involvement in the crime, Judge Allen told their defense lawyers he would not accept the recommended plea bargains of 10 years of probation. Although the men had the right to withdraw their pleas, they each proceeded with their guilty pleas and, in July 1994, were sentenced by Judge Allen to 20 years. Kussmaul appealed his conviction and the court of appeals affirmed, finding the evidence sufficient to corroborate the testimony of the three accomplices.[5]
D. The 2002-2003 Article 64 Motions
Long and Pitts, in 2002, and Kussmaul, in 2003, filed motions for forensic DNA testing of biological evidence under Article 64 of the Texas Code of Criminal Procedure. Long and Pitts swore, in 2002 affidavits, that their pleas and testimony were coerced, that they were factually and legally innocent, that they never raped Murphy, that they never assisted anyone else in raping her, and that they were not present when Murphy was raped nor when Murphy and Neighbors were killed. All three sought testing of evidence that was either not previously subjected to DNA testing or, although previously subjected to DNA testing, could be subjected to testing with newer testing techniques to obtain more accurate and probative results. Attached to Kussmaul's motion was a September 14, 1993, report containing the results of DQ-Alpha testing. Kussmaul said the results
indicated that none of the defendants matched the portion of the semen found in the vaginal swab and the paper towels. However, the results were not absolutely conclusive.
The State filed a brief in opposition to the motion for new testing, in part because 1993 DQ-Alpha testing had excluded all four men as being the source of the DNA on the vaginal swab, paper towels found with bodies, and "scrapings from the door." And "newer more discriminating DNA tests which can be done on smaller samples than in the past will not produce a more accurate result, or a more probative result. All suspects were excluded as the source of the DNA." The State pointed to language in the report that "None of the DQ alpha types obtained from the three suspects matched the DQ alpha types obtained from any of the evidence specimens." The State noted that there was a typo-the "three" should have been a "four." Indeed, another line in the report states, "As the DQ alpha types determined from the evidence specimens do not match the suspects, frequency data is not reported." The State noted that Kussmaul had been given funds for a DNA expert at trial, and did not explain why he did not seek DNA testing on things he was now asking to be tested.[6] The State said that, for Long and Pitts, DNA test results would be "meaningless" or just "muddy the waters." Judge Allen presided over the motions and denied the testing. He concluded that, among other things, identity had not been and was not an issue. In the findings on Kussmaul's case, Judge Allen specifically addressed the DQ-Alpha results, finding that
18. The prior DNA testing produced no results which matched any of the suspects, and therefore excluded and *618 eliminated the suspects, including Defendant, as the source of the DNA on the vaginal swab and paper towels.
19. Because the prior DNA testing did not match and excluded all of the suspects as the source of the DNA on the vaginal swab and paper towels, these former results were both accurate and probative.
In all three cases, Judge Allen found
The results of re-testing of the items will not prove the defendant innocent, and viewing all possible results in a light most favorable to defendant would merely muddy the waters.
The denials were appealed and affirmed.[7] The court of appeals noted in Kussmaul's case that, even if identity were an issue, exculpatory results would not matter: an exculpatory inference "would not outweigh the three accomplice witnesses' testimony, the evidence corroborating such testimony, and Kussmaul's jailhouse confession."[8] In Long's case the court said that "Long does not challenge the court's finding concerning identity." So even if the convicting court applied the wrong standard to the issue of "whether Long would have been prosecuted or convicted if DNA testing yielded exculpatory results, we would not reverse the court's decision."[9] In Pitts' case, the court said: "Had DNA results revealed the presence of Pitts's DNA at the scene, this could indicate guilt. If DNA results revealed the absence of Pitts's DNA at the scene, this neither negates his participation nor disproves his culpability as a party to the offense."[10]
E. The 2012 Article 64 Motions, the 2014 Article 64.04 Hearing and Favorable Finding, and the State's Direct Appeal of the Favorable Finding
In 2012, all four Applicants filed motions for forensic DNA testing to be conducted at their own expense. All filed sworn statements asserting their innocence. After a hearing at which the State again pointed out that the 1993 DNA testing already excluded Applicants, Judge Allen granted the motions, and ordered DNA testing on evidence gathered during the investigation.
On September 12, 2014, after receiving the results, Judge Allen held a hearing pursuant to Article 64.04. Barbara Leal, a senior forensic DNA analyst for Cellmark Forensics testified. Leal testified that all four Applicants, and Stephen Neighbors, were excluded as contributors of the male DNA in the vaginal swabs. The State then made a stipulation.
MR. PRICE: Your Honor, just to save time, we'll stipulate that the evidence or the Y-STR profile obtained from the epithelial fraction of the vaginal swab, which they just went over, the crotch seam of the black jeans, the outer crotch area, and then the-the last one was-
MR. MCKETTA: The paper towel swabs, the semen on the paper towel swabs.
*619 MR. PRICE: All-all of the four defendants and Steven Neighbors are excluded as possible contributors of that so we don't have to go through each one.
Leal testified that testing of the gag resulted in a mixture from two males. Neighbors could not be excluded; Shelton was excluded; no determination either way could be made for Kussmaul, Long, and Pitts. Leal testified that she did not find, on any forensic item, profiles of any of the four Applicants. Instead, profiles found on three samples-the vaginal swabs, the "outer crotch area of the black jeans" and the paper towels-belonged to a common male contributor. "There does appear to be a common contributor, a common male contributor within those three samples.... I can tell you that we got DNA Y-STR profiles from the samples, and they do appear to be consistent with each other." Another unknown male's profile was obtained from the "crotch seam of the black jeans."
The State called Blake Goertz, the DNA section supervisor of the DPS crime lab in Waco. He had no criticism of Leal's analysis or conclusions. Leal and Goertz agreed that the 1993 DQ-Alpha testing on evidence gathered during the investigation of the crime excluded Applicants; both disagreed with Charles Linch's trial testimony insinuating that such results were unlikely in any case and did not exist in this case.
After considering the DNA test results, the testimony and evidence admitted at the hearing, and the records in the cases, Judge Allen entered findings and conclusions. In Kussmaul's case, these were, in full:
1. Orchid Cellmark performed, in accordance with this Court's 2012 orders, Autosomal STR DNA testing and Y-STR DNA testing on all available evidence reasonably likely to contain biological material. All such DNA testing was conducted under reasonable conditions designed to protect the integrity of the evidence and the testing process. All such DNA testing employed a scientific method that is sufficiently reliable and relevant to be admissible under Rule 702 of the Texas Rules of Evidence.
2. Orchid Cellmark has filed reports with the Court containing the results of the DNA testing and all data related to the testing required for an evaluation of the test results. Together with the testimony of the Orchid Cellmark analyst at the hearing, these reports establish that:
a. DNA evidence found on a cutting from the outer crotch of the jeans of the female victim Leslie Murphy includes DNA from an unknown male. Kussmaul; his three co-defendants, James Edward Long; James Wayne Pitts, Jr.; and Michael Dewayne Shelton; and the male victim Steven Neighbors are each excluded as the contributor of the DNA found on this evidence.[11]
b. DNA evidence found on a cutting from the crotch seam of Murphy's *620 jeans includes DNA from an unknown male. Long, Kussmaul, Pitts, Shelton, and Neighbors are each excluded as the contributor of the DNA found on this evidence.
c. DNA evidence found on vaginal swabs taken from Murphy includes DNA from an unknown male. Long, Kussmaul, Pitts, Shelton, and Neighbors are each excluded as the contributor of the DNA found on this evidence.
d. DNA evidence found on slides prepared from a swabbing of a paper towel found with the bodies of Murphy and Neighbors includes the DNA of an unknown male. Long, Kussmaul, Pitts, Shelton, and Neighbors are each excluded as the contributor of the DNA found on this evidence.
e. A comparison of the male DNA profiles obtained from Murphy's vaginal swabs, the cuttings of the outer crotch and crotch seam of Murphy's jeans, and the paper towel slide show that: (i) the same unknown male's DNA is on Murphy's vaginal swabs, the cuttings from the outer crotch of Murphy's jeans, and the paper towel slides; and (ii) another unknown male's DNA is on the cutting from the crotch seam of Murphy's jeans.
f. DNA evidence found on the ends of a gag found in Murphy's mouth includes a mixture of DNA from two males. Shelton is excluded as a contributor to this mixture, but the sample was insufficient to determine whether Long, Kussmaul, or Pitts are contributors to this mixture. Neighbors cannot be excluded as a contributor.
g. For all evidence tested by Orchid Cellmark for which a DNA profile could be obtained, no DNA was found on any of the evidence that matched the DNA profiles of Long, Kussmaul, Pitts and Shelton.
h. One of the Y-STR profiles obtained for the unidentified males met the applicable requirements for comparison with databases with a small number of Y-STR DNA profiles maintained by the Texas Department of Public Safety in Austin and in Waco. No matching profiles were found as a result of that comparison. One of the MiniFiler STR DNA profiles obtained for the unidentified males met the applicable requirements for comparison with the CODIS database maintained by the Texas Department of Public Safety (but not the database maintained by the Federal Bureau of Investigation). This profile was uploaded into the state CODIS database, but no matching profiles were found. All other DNA profiles obtained for the unidentified males do not meet the applicable requirements for comparisons with DNA profiles in the DNA databases maintained by the Federal Bureau of Investigation and the Texas Department of Public Safety.
3. The evidence tested in this proceeding was secured in relation to the offense that is the basis of Kussmaul's conviction and was in the possession of the State at the time of Kussmaul's conviction.
4. The evidence tested under this Chapter 64 proceeding has been subjected to a chain of custody sufficient to establish that no evidence has been substituted, tampered with, replaced, or altered in any material respect.
5. The most persuasive pieces of physical evidence-the DNA extracted *621 from the seminal fluid found on the victim's vaginal swab, the outer crotch and crotch seam of Murphy's jeans, and the paper towel found at the crime scene-all exclude Long, Kussmaul, Pitts, and Shelton.
6. It is improbable that Kussmaul or any of Pitts, Long, and Shelton could have sexually assaulted Murphy without depositing DNA on any of the items of evidence tested under this Chapter 64 proceeding.
7. A Negroid hair was collected from the bodies of Murphy and Neighbors. But Kussmaul and each of the co-movants is Caucasian, not African-American. Accordingly, none of them could have contributed the Negroid hair. The victims Neighbors and Murphy were likewise Caucasian, and could not be the source of the Negroid hair. The Negroid hair was likely deposited by Murphy's assailant.[12]
8. The probative value of the testimony given by Long, Pitts, and Shelton at Kussmaul's trial is outweighed by the persuasiveness of the physical evidence adduced under this Chapter 64 proceeding, for two primary reasons; (i) the plea bargains offered to Long, Pitts, and Shelton created a powerful incentive for each of them to falsely admit culpability; and (ii) material inconsistencies between and among the statements made and testimony given by Long, Pitts, and Shelton call into doubt the veracity of those prior incriminating statements.
9. Each of Long, Pitts, and Shelton was offered a plea bargain if he would plead guilty and testify against Kussmaul. The State offered a sentence of 10 years' probation. Each of Long, Pitts, and Shelton faced the prospect the death penalty if he declined to accept the plea agreement. The inducement of a sentence of 10 years' probation likely caused each of Long, Pitts, and Shelton to agree to sign a false confession, plead guilty, and give false trial testimony against Kussmaul.
10. The written statement signed by Long differed in material respects from the written and oral statements made by Shelton and Pitts. The testimony of each of Long, Shelton, and Pitts at Kussmaul's trial differed in many significant respects from their prior written and oral statements to law enforcement. The various descriptions of the crime given by Long, Shelton, and Pitts differ on such key facts as the circumstances of how they met the victims, the location where the crime took place, the time of the day of the crime, they type of weapon used (pistol or rifle), who held the weapon, and the actions committed by each person.
11. Long, Pitts, and Shelton have each recanted their prior written and oral statements.
12. The DNA testing performed under this Chapter 64 proceeding is more extensive, and has been performed by more authoritative procedures that have produced more probative and accurate results, than any DNA testing *622 available at the time of Kussmaul's conviction.
13. Due to (i) the finding of DNA belonging to two unidentified males on the evidence tested under this Chapter 64 proceeding (including the crotch seam of Murphy's jeans, vaginal swabs taken from Murphy, and on a slide prepared from a swabbing of a paper towel found with the bodies of the victims), (ii) the exclusion of Long, Kussmaul, Pitts, and Shelton by DNA testing, and (iii) the presence of the unidentified Negroid hair that could not belong to any of the victims or the movants, it is reasonably probable that one (or both) of the unidentified males whose DNA was found on the evidence tested, rather than Long, Kussmaul, Pitts and Shelton (or any one or a combination of them) sexually assaulted Murphy and murdered Murphy and Neighbors.
14. Had the DNA results obtained in this Chapter 64 proceedings been available at the time of Kussmaul's conviction, it is reasonably probable that Kussmaul would not have been convicted of the offense of capital murder of Leslie Murphy and Steven Neighbors, as either a principal or a party to the crime.
The findings in Long, Pitts, and Shelton's case were virtually identical, with a conclusion that, had these DNA results been available at the time of Long, Pitts, and Shelton's convictions, it is reasonably probable that Long, Pitts, and Shelton "would not have been convicted of the offense of sexual assault of the female victim Leslie Murphy as either a principal or a party to the crime." Notably, Judge Allen did not mention the availability of the 1993 test results (or lack thereof) or make express credibility findings. Still, he must have credited the four men's recantations by affidavit when he found that, "The inducement of a sentence of 10 years' probation likely caused each of Long, Pitts, and Shelton to agree to sign a false confession, plead guilty, and give false trial testimony against Kussmaul." The State appealed from the trial court's favorable findings. The court of appeals affirmed.[13]
In 1993, DQ-alpha testing was performed on some of the items of evidence. The DQ-alpha testing excluded all four defendants as contributors. Pursuant to the trial court's 2012 order, Y-STR testing was done on more of the evidence. The Y-STR test is a more sensitive and discriminatory test than the DQ-alpha test. The Y-STR testing excluded all four defendants as contributors. However, the Y-STR testing revealed that there was DNA on the tested evidence from two unknown males. The DNA evidence from the unknown males was found on the inner and outer crotch of the victim's jeans and undergarments, and was also found in vaginal swabs. This evidence was not known at the time of the original trial. We find that the trial court did not err in its finding that it was reasonably probable Long, Shelton, and Pitts, Jr. would not have been convicted had the results of the DNA testing been available at trial.... We find that the trial court did not err in its finding that it was reasonably probable Kussmaul would not have been convicted had the results of the DNA testing been available at trial.[14]
*623 II. The Current Applications
Based on the favorable 2014 Y-STR testing results, Applicants filed the Article 11.07 applications that are now before this Court.[15] They make two claims: 1) an Article 11.073 claim that, more likely than not, they would not have been convicted had the newly available scientific testimony been presented to the fact-finder; and 2) an actual innocence claim that, by clear and convincing evidence, they would not have been convicted had the newly available evidence been presented to the factfinder.
We remanded the cases for an evidentiary hearing, and findings of fact and conclusions of law on the merits of these claims. Because Kussmaul, Long, and Pitts' applications are subsequent, we also asked for findings and conclusions on whether their claims are barred by Article 11.07, § 4 of the Code of Criminal Procedure.[16]
A. The July 13-14, 2016, Hearing on the Applications
Long, Pitts, and Shelton all testified at the habeas hearing that: (1) they were unaware of the 1993 DNA results at the time they confessed and pled guilty; (2) they were mentally and physically intimidated into falsely confessing by Deputy Davis who had threatened them with the death penalty; and, (3) they were able to get their stories straight at trial because, a couple of days before it, the prosecutor, Mike Freeman, got the three of them together to rehearse.
1. James Edward Long and the 1995 Affidavit of Russell Hunt (Long's Trial Attorney)
In contrast to his trial testimony, Long now testified that he had no involvement in the crime, and that he had never even met Leslie Murphy or Steven Neighbors. Long testified he does not remember what he was doing on March 20, 1992. At the time he was friends with all three men, he spent time with them all (Kussmaul and Shelton more than Pitts) but he said he was never with them all at the same time. Long acknowledged he knew Claudia McNamara, the bartender at Poor Boys, that he had shot pool with her husband there, and that his own dad hung out at Poor Boys. But he said that because his dad did not like Kussmaul, he would not have been at the bar with Kussmaul. Long said that Davis came to his house in 1993 and he told him that he had nothing to do with the crime. He denied involvement right up until April 1994, some seven weeks before trial. He was then presented with a deal for no jail time. "Mr. Davis took me into an office and he quoted parts of Pitts' statement and he quoted parts of Shelton's statement and he led me through the statement. And at the end of it, I signed it." Shelton said he went from denying involvement to confessing after "Mr. Davis grabbed my arm and pointed out a vein in my arm and told me if I didn't cooperate, I would get the needle in that vein." Regarding the inconsistencies between his thirteen-page *624 April 5, 1994, statement and his trial testimony (and why, if this were all part of a law enforcement conspiracy, the two would not have aligned in the first place) Long responded that he had testified the way he did at the trial itself, because Freeman had taken him, Shelton, and Pitts into a room in the D.A.'s office and prepped them with note cards.
Long said he did not know anything about there being DNA evidence that excluded him back when he confessed and testified. He said that he was aware at the time of trial that some DNA testing had been done because his own DNA had been taken but he never saw the results.
Had I known that that DNA in 1994 cleared me, I would have never taken a plea bargain. I would have never got on the witness stand and lied. I asked Russ Hunt about the DNA. Russ Hunt told me that the DNA would not help me and that they did not want to bring it up in court.
The State introduced the May 3, 1995, affidavit of Russell Hunt, which had been filed in response to an ineffective assistance of counsel claim Long made in his initial Article 11.07 application. In it, Hunt related in part that:
Prior to entering into the plea bargain, Mr. Long gave a number of statements to the police and district attorney's office and subjected himself to several polygraph examinations. As a result of this investigation and examinations, all parties were satisfied that Mr. Long was truthful and his story was accepted by both myself and the investigators. Mr. Long truthfully admitted to participating in the kidnapping and murder of both of the teenagers. He additionally truthfully admitted to sexually assaulting the female victim prior to her death. Finally, he admitted to the physical assault on the male victim prior to his death.
Hunt also averred, "I have been informed by James Long that he has a letter written by James Pitt[s], Jr. alleging that he lied to the police. James Long has told me on a number of occasions that James Pitt[s] is not credible. Additionally, James Long has directly contradicted Pitt[s'] version on a number of occasions."
2. James Pitts, Scott Peterson (Pitts' trial attorney), Pamela Thomas (Murphy's Mother) and Deanna Lee (Pitts' ex-sister-in-law)
Pitts testified that he knew Leslie Murphy, but not Steven Neighbors. He met Murphy "through Belinda Bailey at the Dallas food stamp office" back in 1988 or so. He denied Murphy had called him to say she was coming through town. He did say that, when he realized that Murphy had been killed, he asked a detective for her mother's number and called her "[t]o see how she was doing and if she was okay."
Pitts said he was first asked about the crime about a week after it. He spoke to Deputy Abner, who had come to his mother's house. He told Abner he knew Murphy but that he had nothing to do with the crime. A year later is when Deputy Davis interrogated him. Pitts wrote multiple statements over multiple days. He claimed that the facts in his statements came from "Mr. Davis." He said he was unaware that DNA tests had excluded him as a contributor of the collected DNA. He only learned that fact "[w]hen Mr. Kussmaul sent [the results] to me while I was in prison." Pitts said that he told his attorney Scott Peterson that he was being physically and mentally intimidated by Davis and that Peterson said he would look into it, but "when he came back, he told me straight to my face, I dug that grave, I have to lay in it." Pitts said that he persisted in his plea *625 because he was told that if he withdrew it, the DA would charge him with capital murder.
Pitts' trial counsel, Scott Peterson, testified that Pitts had already confessed by the time he got the case. He recognized that Pitts had a low IQ (of 68), and was cautious with the case because of that and "also because when the offer came of 10 years probation on a capital murder case, that was highly unusual from my experience." Pitts went over the facts with him and was "very clear" that what happened is Kussmaul was the one who shot and killed Leslie Murphy and Steven Neighbors: "I do remember there were four involved and that he had said Kussmaul was the guy in charge. He's the one with the-I think it was a rifle, if I recall. And that the other three were kind of-kind of going along with what he ordered." Pitts explained in "graphic" detail the actual rape. Peterson said he took Pitts at his word. He said he was satisfied that Pitts had truthfully admitted involvement based on their one-on-one discussions and "him giving me specificity of what he did and how it happened," as well as his own discussions with Long and Shelton's counsel-who did not express concerns that the confessions of their own clients were false. Because Pitts "presented what could have been a defense of duress, that he was coerced into doing the actions he took ... the actions that he pled guilty to, the sexual assault," Peterson told Pitts if he went to trial he could raise the defense of duress. Peterson said he was unaware of any DNA evidence.
Q ... if you had been aware of DNA results excluding Mr. Pitts as a contributor of the evidence collected in this case, would you have felt it appropriate to advise him to take a guilty plea in this case?
A Absolutely not. In fact, I would have taken a whole lot more steps had I known that.
Peterson said Pitts never told him, after Judge Allen refused to accept the plea bargain, that he had lied and that he wanted to withdraw his plea of guilty. He would not have prevented Pitts from withdrawing his plea, especially because duress was an available defense.
Pamela Thomas, Murphy's mother, testified that she sent a letter to all four Applicants and that Pitts and Shelton responded. Pitts, in a letter dated February 18, 2002, acknowledged that he knew her daughter, but denied involvement in the crime. He said he met Murphy in 1988-89 in Dallas. He said in part,
I got drug[ ] into this crap all because I told my sister that I knew of Leslie and one of my sisters ex-friends went and lied to the cops, saying that I knew something about Leslies murder because I knew of her.... I only knew of what happened to Leslie because Belinda (ex-girlfriend) called and told me about it and Also because I seen it on t.v.
Thomas explained that this denial of responsibility made her angry.[17]
Deanna Lee, Pitts' one time sister-in-law, testified that she took it upon herself, sometime in 2003, to write Pitts because "nobody was communicating with him or seeing him." She exchanged letters with him and also visited him in prison. During these contacts, Pitts had requested Lee's help in proving him innocent. Pitts provided Lee with copies of trial documents ("transcripts, confessions, and all of that stuff, the court documents that he had gotten over the years"). Afterwards, she told him "if you want me to help you in any way, you're going to have to tell me *626 what your involvement was in-in the crime."
Q Okay. So how did he respond?
A He told me that he-that he was not guilty of-of the crime of murder or sexual assault, but he was present and that he was told by Kussmaul to stay in there in the living room with the boy and not let him go anywhere.
In Pitts' description to Lee, Kussmaul, Long, and Shelton were in a bedroom of the trailer house with Murphy, while he kept an eye on Neighbors. Pitts said he was fearful of Kussmaul, that Kussmaul had threatened him. Pitts said Kussmaul shot Murphy and then "came and got the boy and-and shot him too."
Q Okay. Continue.
A And then, he said that-of course, at that point he had the gun. [Kussmaul] had the gun and told them, the other three defendants, to take the bodies and put them in the back of the truck and forced them to lay on top of the bodies and drove around and dumped the bodies and then he took the other two, Long and Shelton, back and dropped them off and then he drove Jimmy around for a few hours making sure that he would not tell what happened and that he would kill him if he did. So he said he was scared for his life.
* * *
Q Okay. Do you recall this as being one specific conversation about this topic?
A Pretty much, yeah.
Q Okay.
A I kind of wanted to distance myself after that.
Lee said that he told her he had confessed and then lied in court because Davis "beat him up." Lee said she was nervous and scared to testify at the present, 2016, hearing, and she was brought in the back way. She feared for her personal safety because she had been threatened by a member of Pitts' family.
3. Michael Shelton and Pamela Thomas (Murphy's Mom)
Shelton testified that he found out about the double murder from the news. He had never met or even seen Leslie Murphy or Steven Neighbors. He said that Deputy Davis came to ask him questions about the crime in early 1993. He asked for DNA samples and he asked him to take a polygraph. He cooperated, "[b]ecause I had nothing to hide." He said Davis interviewed him for a couple hours, and "the conversation started off real rough." Davis told him "I've got people that's already told me you did it." Shelton said Davis was physically aggressive with him and that he ultimately "confessed to doing it for the same reason that Mr. Long did. Out of fear for it." Shelton also testified about the pre-trial meeting with Freeman.
Q Okay. And tell us what happened at that meeting. This is about how long-about how long before the Kussmaul trial?
A This was like just-I would say just days, a couple of days before his trial.
Q Okay.
A Because we was called in. And I-when I walked in, I seen the other two and it was just Mr. Freeman. And he said, this stuff don't match. We can't go to trial like this.
Q So what happened then?
A So he had a board up and had little-some kind of little cards. But then he said, look, you did this. You said here, you told me you did this part. And, Mr. Shelton, you told me you did this part. And, Mr. Long, you told me this part. These don't match. We've got to get them to match before *627 we can go into trial for your testimony.
Q Okay.
A And that's how we got that story straight.
Shelton said he could account for his whereabouts on the night of the murder: "On March 20th and 21st, me and our two girlfriends, Kendra Dryden and Bamba Davis and Mr. Kussmaul, we was drinking beer and watching TV and playing cards at that trailer house." Specifically, they were playing "strip poker." Shelton said the parts of his testimony that related the layout of the trailer, and the roads around the area were true, but that the only knowledge he had of the sexual assault and murders "is what Roy Davis told us." On cross-examination Shelton said though he had been asked for a DNA sample, he never told his attorney, Dwight Goains, about that. And "[n]othing was told to me about anything about DNA coming back"; he never talked to Goains about DNA.
Pamela Thomas, Murphy's mother, read aloud the reply letter she received from Shelton, dated February 15, 2002. In this letter, Shelton stated in part:
First, I would like to address your question, "Why." As an adult you should understand the concept of peer pressure. Where a group of people can influence someone to do something against their will. This is just part of the reason.
Now, while I was younger, I got mixed in with the wrong crowd. I got to drinking and my not being sober allow my then "buddies" to talk me into doing things I didn't want to do. Being under both the influences of alcohol and peer pressure, I did wrong. That is my answer to why.
Your other question for me was what have I learned. To be completely honest with you, ma'am, I have learned a whole lot more than I expected....
Thomas testified that the letter made her "feel a little bit better" because Shelton had "answered my questions." She was mad about Shelton's testimony at the current, 2016, hearing, "Because in the letter and at the trial, he said he was sorry for what he had done. And then he says now it's a lie."
4. Deputy Roy Davis (The Investigator )
Roy Davis, now retired from the McLennan County Sheriff's Department, testified that he was the second detective assigned to the case. Davis testified that both he and the prosecutor, Mike Freeman, had been in possession of the 1993 DNA results during the original investigation. He received the results September 28, 1993, about eight months before Kussmaul's trial. "At the-at the time everything that I was told was we could not exclude-include[ ] or exclude anybody-based on DNA that far back." He also said that "at that time, DNA was very new. Whatever came to me, I sent to the D.A.'s office."
Davis said that, before the 1994 trial, he tried to find the source of the two Negroid hairs found with the bodies of the victims. Jonathan Krebbs' mom's boyfriend was African-American, but DNA tests excluded him as a source of the hairs. Davis said he did not further investigate Jonathan Krebbs because "the evidence did not take me there"; "the evidence took me to the other guys." Davis acknowledged that Krebbs, when interviewed by the Texas Rangers, said: that he was associated with the Latin Kings gang; that Murphy had stayed at his house in Waco two days before she was found murdered; that he was upset that she brought her new boyfriend to Waco; that he and Murphy argued and had a slight physical altercation; and that she was supposed to see him *628 again in a few days upon her return from San Antonio.
Davis flatly and emphatically denied ever having threatened any of the Applicants in the case.
5. Mike Freeman (The Prosecutor )
Mike Freeman, one of two prosecutors in the Kussmaul trial but a sitting County Court at Law Judge in McLennan County at the time of the 2016 hearing, said that all files were open files. Freeman said Deputy Abner, the original detective on the case, had told him the best shot at getting to the truth of what happened was to talk to Michael Shelton, so he worked with Shelton's attorney and got some admissions. He then went to Pitts and did the same thing.[18] He made a representation to Shelton and Pitts that he would recommend probation to the court if they cooperated and told the truth. He made the same representation to Long. He acknowledged that he prepared the three accomplices to testify against Kussmaul, together and without their attorneys, but said he never used note cards and he had "never instructed a witness what they have to say." After Judge Allen indicated to all parties he would not follow the plea agreement, Freeman stood by his recommendation of probation, but otherwise played no role. The 20 year sentences were Judge Allen's decision. Freeman believed when the testimony was elicited at trial that it was true.
Q -is there any doubt in your mind that those three individuals were guilty of sexual assault?
A There's no doubt in my mind that they had the opportunity to withdraw their plea, didn't, and pled guilty to it.
Q And what you heard from the witness stand during that trial you believed was truthful?
A That's correct.
Q With respect to Bryan Kussmaul, is there any doubt in your mind that he was guilty of capital murder?
A At that time, there's no doubt in my mind. He was guilty based on the trial. What's happened since then, I haven't been kept up-to-date on.
Freeman testified that, by the terms of the plea agreements, if the trial court did not approve of the plea bargain, they could withdraw their pleas and the State could seek prosecution for any offense related to sexual assault, but not capital murder. He agreed that it nevertheless made sense for Long, Pitts, and Shelton's attorneys to discuss the risk of prosecution for capital murder. Freeman said that as far as he knew, the DNA tests "were not able to exclude anybody. That's the only evidence I had at the time." He did not realize that the State's expert at trial had left a false impression.
Q ... And what we're-so what I'm-what I'm working on is this. If you knew that there were DNA test results finding DNA evidence on seminal fluid in the vaginal area of Leslie Murphy that excluded these four men, all four, if you knew that, would you have-
A Which-
Q Would you have-let's make that record clear. You did not know it during that trial?
A Correct.
Q If you had known it, you would not have put on or sponsored any evidence suggesting that there was no DNA?
A I believe that's correct.
Q And you can't imagine that First Attorney Long would have done so?
*629 A No. Mr. Long is a very ethical person. He would not.
6. Kendra Dryden Schmidt (Kussmaul's Ex-Girlfriend)
Kendra Dryden Schmidt testified that she and her sister Bamba lived at the trailer off Tower Drive back in 1992, that her mother and grandmother lived in a trailer behind them, and that she knew all four Applicants because they "were high school classmates. And we lived in a small town. We all grew up together." She disputed Shelton's current assertion that they were playing cards (strip poker) at the trailer on the night of the crime. She knew about the crime. "It was the talk of everything."
Q You would remember if one day you went to your trailer and there were bloodstains or gunshot holes inside your trailer? You would remember that, would you not?
A Oh, yes, because my mother would be there.
Q Yeah. She'd probably be the first one over. And that never happened?
A No, sir.
She acknowledged that she had made conflicting statements in 1992 and 1993. She made the 1993 correction because she had found some notes her sister had written at the time. But her testimony at the 2016 hearing was that she could not confirm any of those dates: "I can't tell you dates-from last week what I was doing sometimes with my children-."
7. State's Concession
At the end of the habeas hearing the State conceded that Kussmaul is entitled to a new trial because his trial counsel had DNA results but failed to correct a false impression left with the jury: "My argument comes more from an ineffective assistance angle than it does newly discovered evidence or anything of that nature. And I just want to be clear for the Court. And I absolutely do not agree that he is innocent."[19] The State continued to argue that the claims of Long and Pitts were barred under Article 11.07, § 4 or else, like Shelton's, should be denied because they pleaded guilty.
B. Judge Allen's Post 2016 Hearing and Findings and Conclusions on the Current Applications
After the 2016 evidentiary hearing, Judge Allen made findings and conclusions incorporating in full the Article 64.04 findings and conclusions he had entered on October 2, 2014. In Kussmaul's case, he added, in full:
1. In Cause No. 1993-773-C, Kussmaul pled not guilty and was convicted of Capital Murder by a jury. He was sentenced to life and is currently incarcerated in the Institutional Division of the Texas Department of Criminal Justice.
2. Mr. Kussmaul is "confined" for purposes of Section 3(c) of Article 11.07 of the Texas Code of Criminal Procedure.
3. After considering the records of Kussmaul's case, the evidence introduced in his jury trial, the pleadings, evidence and prior *630 Findings of Fact and Conclusions of Law entered at the Chapter 64 hearing for Kussmaul and James Wayne Pitts, Jr. in Cause No. 1993-511-C, Michael Dewayne Shelton in Cause No. 1993-[510]-C, and James Edward Long, in Cause No. 1993-497-C, all of which are made a part of the record in this matter, the Court finds there are controverted, previously unresolved facts material to the legality of Kussmaul's confinement.
4. The Findings of Fact and Conclusions of Law entered by the Court on October 2, 2014 pursuant to Article 64.04 of the Texas Code of Criminal Procedure are incorporated in full into these Findings of Fact and Recommendations and are attached hereto. In making these Findings of Fact and Recommendations, the Court further relies on its personal knowledge of the jury trial of Kussmaul.
5. This application for writ of habeas corpus is the latest of a series of seven prior applications for writ of habeas corpus filed by Kussmaul, the latest of which was dismissed on March 25, 2009 (Tex. Ct. Crim. App. # WR-22,586-07).
6. The Court finds that although the application filed by Kussmaul is a subsequent application under Section 4 of Article 11.07 of the Texas Code of Criminal Procedure, the current claims and issues have not and could not have been presented previously in any of Kussmaul's previous applications because the legal basis and factual basis for the claims being brought by Kussmaul were unavailable at the time of Kussmaul's previous applications.
7. The DNA results obtained in the recently concluded Chapter 64 proceedings in Kussmaul's case were not ascertainable through the exercise of reasonable diligence by Kussmaul on or before the date on which any previous application was filed because the DNA testing method used to obtain the DNA results in the Chapter 64 proceeding did not exist on the date on which the original application was filed. Further Kussmaul did not have a way to test evidence in the possession of the State until 2001 with the addition of Chapter 64 to the Texas Code of Criminal Procedure.
8. Kussmaul could not have sought relief under Section 11.073 of the Texas Code of Criminal Procedure on the date that he filled the previous applications because Article 11.073 did not take effect until 2013.
9. Pursuant to Article 11.07 of the Texas Code of Criminal Procedure, the Court finds that the new evidence in this case constitutes clear and convincing evidence that no reasonable juror would have found Kussmaul guilty beyond a reasonable doubt had the new evidence been available at trial. Kussmaul is actually innocent of Capital Murder, the crime for which he has been convicted. Accordingly, the Court recommends that habeas relief be granted.
10. The Court further finds that relevant scientific evidence, specifically the evidence developed pursuant to DNA testing ordered by this Court under Article 64.01 of the Texas Code of Criminal Procedure, is currently available and was not available at the time of Kussmaul's trial because the evidence was not ascertainable through the exercise of reasonable diligence by Kussmaul before his trial. The scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of Kussmaul's current application. Had the evidence been presented at trial on the preponderance of the evidence *631 Kussmaul would not have been convicted. The Court finds that the field of scientific knowledge and the scientific method relating to the evidence developed pursuant to the Chapter 64 proceedings in Kussmaul's case have changed since Kussmaul's previous applications were filed.
11. The Court hereby orders the Clerk of the Court to immediately transmit to the Court of Criminal Appeals, under one cover, the application, any answers filed, all motions filed, transcripts of all hearings, including the Chapter 64 DNA hearings, any affidavits, and the record in Cause No. 1993-773-C, including the transcripts of the jury trial of Kussmaul, and any other official records utilized by this Court in resolving issues of fact.
The findings in Long, Pitts, and Shelton's case were virtually identical. Judge Allen found that Long and Pitts, like Kussmaul, met the section 4 bar. He also found that Long, Pitts, and Shelton had each proved entitlement to relief under both Article 11.073 and the actual innocence standards, and expressly stated that Long, Pitts, and Shelton are "actually innocent of sexual assault."
Again, Judge Allen did not mention the availability of the 1993 test results (or lack thereof) or make express credibility findings. But because he incorporated his 2014 findings (where he implicitly credited all four men's recantations by affidavit) into his 2016 findings, and he recommends relief on actual innocence grounds, he necessarily credits Long, Pitts, and Shelton's habeas testimony over their trial testimony, statements and guilty pleas. He must also have again credited Kussmaul's recantation by affidavit, and though he made no findings about the alleged intimidation by Deputy Davis and coaching by Mike Freeman, he apparently remained convinced, as he was in 2014, that "Each of Long, Pitts, and Shelton faced the prospect of the death penalty if he declined to accept the plea agreement."
III. File and Set
On November 9, 2016, we ordered all four applications be filed and set for submission to determine whether (1) Kussmaul, Long, and Pitts' claims are barred by Article 11.07, § 4 of the Code of Criminal Procedure ; (2) Applicants are entitled to relief under Article 11.073; and (3) Applicants are actually innocent.[20] The State, in its briefing, does not appear to stand by its concession that Kussmaul is entitled to a new trial (or that his claims are not barred by Article 11.07, § 4 ). We find that Kussmaul, Long, and Pitts' claims are not barred by Section 4, Applicants are entitled to relief under Article 11.073, but Applicants have not met their burden to establish that they are actually innocent.
A. Applicants Long, Pitts and Kussmaul's Claims Are Not Barred by Article 11.07, § 4 of the Code of Criminal Procedure
Between the 1994 convictions and the 2012 Article 64 motion, Kussmaul filed seven applications, Long one, and Pitts two. All were denied or dismissed. Their last-filed applications all preceded the Y-STR DNA testing: Kussmaul's -07 application *632 was filed in 2009,[21] Long's -01 application was filed in 1995, and Pitts' -02 application was filed in 2003. Kussmaul, in his -04 application, filed in 2001, and Pitts, in his -02 application, filed in 2003, raised actual innocence claims based on the 1993 DQ-Alpha results. Like all previous subsequent applications in these cases, this Court dismissed these applications under Article 11.07, § 4.
The question here is whether their current subsequent applications meet the Article 11.07 § 4 bar, that is, whether the applications contain sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt. TEX. CODE CRIM. PROC. art. 11.07, § 4(a).
1. New Factual Basis
The factual basis for a claim is "unavailable" when the facts supporting the claim are not "ascertainable through the exercise of reasonable diligence on or before the date the previous writ was filed." TEX. CODE CRIM. PROC. art. 11.07, § 4(c). These new test results were not available when any of the Applicants filed their prior writ applications, nor were they "ascertainable through the exercise of reasonable diligence" on or before those dates. The DNA results underpinning the current applications were obtained through DNA testing ordered in 2012. Until 2012, Kussmaul, Long, and Pitts' prior efforts to get evidence tested were denied, and the denials were affirmed on appeal. These Applicants, along with Shelton, again, in 2012, sought DNA testing, this time at private expense, and the motions were granted.
The State contends that the 2014 test results do not constitute new facts for the purposes of Article 11.07 § 4 because the 1993 DQ-Alpha results and Y-STR 2014 test results "present a distinction without a difference."
The simple fact is that the 1993 DQ-alpha testing revealed the presence of DNA that did not come from any of the co-defendants. Logically and obviously, that DNA came from someone. The 2014 Y-STR testing revealed an identifiable DNA profile of those "someones." But this additional information adds no relevant fact that was not known before Kussmaul's trial. At most, it means that a DNA comparison can be made to as-yet unknown individuals. We knew as much in 1993.
And so, the State argues, "The Y-STR testing results are at best cumulative of other DNA evidence, which has already been evaluated and dismissed by this Court." Regarding Kussmaul and Pitts, the State asserts, "any newly contrived claim based on previously determined claims is barred under Article 11.07, § 4." Regarding Long, the State says that the Section 4 bar has not been met because he could have raised DNA-based claims in his previous application.
We disagree. First, the notion that the true nature of the 1993 results were available to any of these men before trial is not supported by the record. Some actors may have been aware that testing had taken place, but none were aware that the results from the rape kit excluded all four *633 men. Rather, the testing/results were understood: by the investigator to "not exclude-include or exclude anybody"[22] ; by the prosecutor as "not able to exclude anybody"[23] ; by Kussmaul's attorney as containing "some incriminating aspects," "certainly suspicious" and susceptible to being "viewed in an inculpatory manner"[24] ; and to Long's attorney (according to Long) not helpful so "that they did not want to bring it up in court."[25] If even the prosecutors who tried Kussmaul did not "know as much in 1993," we fail to see how Applicants knew, or could be expected to have known, as much. Second, Y-STR technology allowed testing on Murphy's jeans for the first time-jeans that had been cut out at the crotch, and that testing excluded the Applicants. And unlike DQ-Alpha testing, which can only exclude people, the Y-STR testing revealed the genetic profiles of two unidentified men-one on three different items. These men are unaccounted for under the State's theory of this crime-as set forth by Long, Pitts, and Shelton-at Kussmaul's trial. They are the source of the semen found in Murphy's vagina and on the paper towels lying next to her body, and on the crotch of her jeans. This DNA is present in multiple samples and intimate locations, and could not have gotten there by accident. These are quintessential new facts for purposes of Section 4.
2. New Legal Basis
The legal basis for a claim is "unavailable" if it was "not recognized by and could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state" on or before the date the previous writ was filed. TEX. CODE CRIM. PRO. art. 11.07, §§ 4(a)(1), 4(b). Enacted in 2013, well after Kussmaul, Long, and Pitts' last-filed applications, Article 11.073 provides a statutory, non-constitutional pathway to habeas relief in cases in which "relevant scientific evidence" was not available to be offered at a convicted person's trial or contradicts scientific evidence the state relied on at trial. TEX. CODE CRIM. PRO. art. 11.073, § (a). Article 11.073 can be a new legal basis under Article 11.07, § 4(a)(1) for a subsequent application. Ex parte Robbins , 478 S.W.3d 678, 689 (Tex. Crim. App. 2014). Applicants Kussmaul, Long, and Pitts rely on scientific evidence currently available that was not available at the time of Kussmaul's trial and Long and Pitts' pleas of guilty, because it is the product of newly available DNA techniques. They rely on a legal basis, Article 11.073, that was unavailable on the date Applicants filed their previous applications.
3. Conclusion on Procedural Bar
These three Applicants have met the requirements for submission of a subsequent application on both factual and legal grounds, and we now proceed to consider the merits of these Applications, along with Shelton's initial Article 11.07 application.
B. Applicants Are Entitled to Relief Under Article 11.07/11.073
1. The Preponderance Standard *634 Article 11.073 applies to relevant scientific evidence that: (1) was not available to be offered by a convicted person at the convicted person's trial; or (2) contradicts scientific evidence relied on by the state at trial. TEX. CODE CRIM. PRO. art. 11.073(a)(1)-(2). Relief can be granted under Article 11.073 upon a threefold showing that:
1. "relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and"
2. "the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application; and"
3. "had the scientific evidence been presented at trial, on the preponderance of the evidence the person would not have been convicted."
TEX. CRIM. PROC. CODE § 11.073 (b) (1)-(2). We have previously noted that the legislature clearly intended Article 11.073 and Chapter 64 to work together. Specifically, Article 11.073 affords an avenue for relief under the same standard required for a favorable Chapter 64 finding. As we noted in Ex parte White ,
Both Chapter 64 and Article 11.073 are remedial statutes that concern scientific evidence, and the presence of identical standards of proof in both statutes suggests that the legislature contemplated that these statutes would sometimes work together. A showing by a mere preponderance of the evidence that an applicant would not have been convicted if exculpatory DNA results are obtained is not sufficient to warrant relief under this Court's more onerous actual-innocence jurisprudence. But Article 11.073 affords an avenue for relief under the preponderance standard. The fact that these statutes are not only similar in purpose and operation, but also appear designed to work together, with the identical phrase accomplishing that cooperation, strongly supports interpreting the same phrase to mean the same thing.
506 S.W.3d 39, 44 (Tex. Crim. App. 2016). The practical result of the coinciding standards is that a favorable Chapter 64 finding, so long as it is agreed with by this Court, can result in habeas corpus relief. TEX. CRIM. PROC. CODE § 11.073. But the opposite is also true. Ex Parte Pruett , 458 S.W.3d 535, 537 (Tex. Crim. App. 2015) (per curiam) (holding that where trial court and this Court during Chapter 64 proceedings found that inconclusive DNA evidence did not support a reasonable probability that applicant would have been acquitted had that evidence been available at his trial, applicant is foreclosed from obtaining relief under Article 11.073 ).
2. The Standard of Review- Article 11.07
On post-conviction review of habeas corpus applications, the convicting court is the "original factfinder." The trial judge, not this Court, is responsible for gathering evidence and making fact-findings. Ex parte Simpson , 136 S.W.3d 660, 668 (Tex. Crim. App. 2004). This Court is the "ultimate factfinder." Ex parte Reed, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008). We have a statutory duty to review the trial court's factual findings and legal conclusions to ensure that they are supported by the record and are in accordance with the law. Simpson , 136 S.W.3d at 668. We will defer to and accept a trial judge's findings of fact and conclusions of law when they are supported by the record. Reed , 271 S.W.3d at 727. But if our independent review of the record reveals that *635 the trial judge's findings and conclusions are not supported by the record, we can exercise our authority to make contrary or alternative findings and conclusions. Id.
3. Applicants Are Entitled to Relief under Article 11.07/11.073
There is no question that two of the three requirements for Article 11.073 relief are met, that of Article 11.073 (b)(1)(A) and (B).
(A) relevant scientific evidence is currently available and was not available at the time of the convicted person's trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during the convicted person's trial; and
(B) the scientific evidence would be admissible under the Texas Rules of Evidence at a trial held on the date of the application;
TEX. CRIM. PROC. CODE § 11.073 (b)(1)(A), (B). Texas has long recognized the admissibility of DNA evidence under Rule 702. Kelly v. State , 824 S.W.2d 568, 574 (Tex. Crim. App. 1992). And the Y-STR testing was not available to Applicants in 1994. The difference between DQ-Alpha testing and Y-STR testing is something the Supreme Court has noted. "DQ Alpha testing is a relatively inexact form of DNA testing that can clear some wrongly accused individuals, but generally cannot narrow the perpetrator down to less than 5% of the population." Dist. Attorney's Office for Third Judicial Dist. v. Osborne , 557 U.S. 52, 57, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009). But, "there have been several major advances in DNA technology, culminating in STR technology. It is now often possible to determine whether a biological tissue matches a suspect with near certainty." Id. at 62, 129 S.Ct. 2308. STR technology is both more "sensitive"-capable of producing results from smaller samples-and more "discriminatory"-capable of extracting profiles from samples containing a mixture of several persons' DNA.[26] The question left is whether we agree with Judge Allen's findings that, "had the scientific evidence been presented at trial, on the preponderance of the evidence" Applicants "would not have been convicted." TEX. CRIM. PROC. CODE § 11.073(b)(2).
The 2014 Y-STR results tie this crime to two discrete men-men altogether unaccounted for in Long, Pitts, and Shelton's several statements and trial testimony, and it does so with "near certainty." This is persuasive exculpatory evidence. Although this case does not appear to be a "lone attacker case"-as DNA suggests at least two men took part in the crime-we agree with Judge Allen and Applicants that, had this evidence been presented at trial, on the preponderance of the evidence, the Applicants would not have been convicted. Esparza v. State , 282 S.W.3d 913, 922 (Tex. Crim. App. 2009) ; Blacklock v. State , 235 S.W.3d 231, 232 (Tex. Crim. App. 2007) ; Smith v. State , 165 S.W.3d 361, 365 (Tex. Crim. App. 2005). The State argues that none of these men are entitled to relief under Article 11.073, because the 2014 Y-STR evidence is not "new," as discussed above, and second because "though the absence of DNA could suggest that the applicants did not have sexual intercourse with Leslie Murphy, it does *636 not show conclusively that they did not have sexual intercourse with her."
The State points to Ex parte Holloway , a manslaughter case in which we denied relief on an actual-innocence claim though the trial court had recommended granting it. 413 S.W.3d 95 (Tex. Crim. App. 2013) (per curiam). A knife found in Holloway's car had tested presumptively positive for blood and witnesses testified at trial that it looked like the knife Holloway wielded during the melee that led to the death of the victim Ashley Lee. The implication at trial was that the knife recovered from Applicant's car was the knife he used to stab three people (including Ashley Lee) during the melee. Id. at 96-97. Post-conviction DNA testing indicated that the blood on the knife was not Ashley Lee's. Id. at 96. We held that Holloway did not meet the clear and convincing standard in light of the testimony of the witnesses who saw Holloway with a knife, saw him use the knife, or were themselves injured by his use of it, "whether or not it was the same knife found in his car after the offense." Id. at 98. See also Whitaker v. State , 160 S.W.3d 5, 9 (Tex. Crim. App. 2004) (a DNA test of the murder weapon would be meaningless under facts of the case).
Long, Pitts, and Shelton all testified at the habeas hearing that they would not have pled guilty and testified against Kussmaul if they had known of exculpatory DNA test results. There is a gap between Long, Pitts, and Shelton's testimony at trial about what happened, and the physical evidence in this case. And this in turn calls into question the reliability of the result in Kussmaul's trial.
The record supports that 1) relevant scientific evidence is currently available that was not available at the time of trial because it was not ascertainable; 2) the scientific evidence would be admissible at trial; and 3) had the evidence been presented at trial, on the preponderance of the evidence, Kussmaul would not have been convicted of capital murder, and Long, Pitts, and Shelton would not have been convicted of sexual assault.
We now turn to the question whether the additional, newly available evidence, when compared to the evidence establishing guilt, moves these cases to the next level, that is, where no rational juror would have convicted Applicants.
C. Applicants Have Not Accomplished the Herculean Task of Satisfying Their Burden on a Claim of Actual Innocence
1. The Clear and Convincing Standard
A Herrera claim is a bare claim of innocence based solely on newly discovered evidence. Ex parte Brown , 205 S.W.3d 538, 544 (Tex. Crim. App. 2006). An applicant claiming actual innocence is not claiming that the evidence at trial was insufficient to support the conviction. Ex parte Tuley , 109 S.W.3d 388, 392 (Tex. Crim. App. 2002). Rather, "the successful applicant shows by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence." Brown , 205 S.W.3d at 545. An applicant must also prove that the evidence he relies on was not known to him at the time of trial and could not be known to him even with the exercise of due diligence. Id. Although many actual-innocence cases are based on a single piece of new evidence such as DNA or the recantation of a victim or witness, "multiple pieces of newly discovered evidence" can together make a meritorious case for relief. Ex Parte Miles , 359 S.W.3d 647, 671 (Tex. Crim. App. 2012). In practice, we highlight certain pieces of new evidence and discuss whether the new evidence *637 persuasively establishes innocence when comparing it to the evidence establishing guilt. See, e.g., Ex Parte Navarijo , 433 S.W.3d 558, 568 (Tex. Crim. App. 2014).
The habeas applicant is charged with making a "truly persuasive" showing of innocence, regardless of whether the applicant pled guilty or had a jury trial. Brown , 205 S.W.3d at 544. A convicting court is not free to ignore a guilty plea when reviewing a collateral attack. Tuley , 109 S.W.3d at 392. Rather, the court charged with deciding such a claim should make a case-by-case determination about the reliability of the newly discovered evidence under the circumstances. Id. Once the applicant provides new reliable evidence of innocence-whether it be exculpatory scientific evidence, trustworthy recantations or eyewitness accounts, or critical physical evidence-it is appropriate for the habeas court to proceed with the weighing of it against the evidence of guilt produced at trial. See Ex parte Elizondo , 947 S.W.2d 202, 206 (Tex. Crim. App. 1996). The habeas court then makes findings of fact and conclusions of law, and a recommendation to this Court.
2. The Standard of Review-Actual Innocence
As with any habeas claim, we generally defer to findings of fact when the trial court is in a better position to determine witness credibility. Ex parte Thompson , 153 S.W.3d 416, 418 (Tex. Crim. App. 2005). But we nevertheless can exercise our authority to make contrary or alternative findings and conclusions when our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record. Id. at 417-18.
3. Applicants Are Not Entitled to Relief under the Actual Innocence Standard
The evidence presented in support of this Herrera innocence claim is affirmative, including both exculpatory scientific evidence and recantations. Judge Allen weighed this new evidence of innocence against the evidence of guilt produced at the trial and pleas of these cases, and made findings of fact and conclusions of law, recommending that this Court grant relief to all four Applicants on actual innocence grounds. In 1994, Judge Allen heard Long, Pitts, and Shelton testify against Kussmaul at trial. He took Long, Pitts, and Shelton's pleas. In 2016 he heard from these men again. In his findings and recommendations, Judge Allen stated that he was relying not just on the record evidence but on his "personal knowledge" of those earlier proceedings. Nevertheless, we here exercise our authority to make contrary or alternative findings and conclusions because our independent review of the record reveals that some of Judge Allen's findings and conclusions are not supported by the record. Applying the actual-innocence standard described above to the facts of this case, we conclude that Applicants have failed to meet that standard in light of our own assessment that Long, Pitts, and Shelton's habeas testimony is not entirely credible, while aspects of their trial testimony are, as detailed above, corroborated.
a. Long, Pitts, and Shelton's Habeas Testimony Is Not Entirely Credible
Long, Pitts, and Shelton testified in 2016 and explained that they had falsely confessed and pled guilty, despite their innocence, because of promises of leniency if they did and threats of the death penalty if they did not. And a guilty plea is no bar to a claim or finding of actual innocence, but a guilty plea is of consequence to the calculus. As we stated in Tuley , convicting *638 courts should give great respect to knowing, voluntary, and intelligent pleas of guilty. 109 S.W.3d at 391. Here, Long, Pitts, and Shelton all failed to withdraw their pleas even when the consequences changed, when the promises of leniency and the threats of the death penalty were no longer on the table, but a twenty year sentence was on it.
This distinguishes Long, Pitts, and Shelton's cases from Tuley . Tuley's guilty plea came after a contested trial and jury efforts to reach a verdict that resulted in a 10-2 split among the jurors with the majority favoring acquittal. As Professors Dix and Schmolesky recognize, Tuley had "an unusually credible explanation for his guilty plea and judicial confession of guilt that was arguably consistent with his claim of actual innocence."
He produced evidence that he had been in jail for 10 months pending trial and would have to remain jailed pending further pursuit of his not guilty plea. His plea resulted in community supervision and thus release; it seems likely that the plea was pursuant to an agreement for that result. He had also learned that if he continued to resist conviction, he would no longer be able to have the representation of retained counsel who had generated at least reasonable doubt in the minds of 10 jurors in the first trial. Thus, he made a quite credible case for the proposition that despite innocence, he perceived the plea-and an inaccurate judicial confession-the least costly responses to the situation.
43B GEORGE E. DIX & JOHN M. SCHMOLESKY, TEX. PRAC., CRIMINAL PRACTICE AND PROCEDURE § 59:37 n.6 (3d ed. 2011). In other words, Tuley's decision to plead guilty was influenced by factors that had nothing to do with his guilt. We agree that similar factors could have influenced Applicants Long, Pitts, and Shelton's initial pleas. But once the bargain for no jail time was off the table, they persisted in their pleas. Although each testified they still feared prosecution for capital murder, we cannot fully credit those claims in light of the plea papers, which provided that if the bargains were not followed, Applicants could withdraw their pleas and face only charges related to the sexual assault. We stated in Ex Parte Harleston that:
[O]ur deference is not a rubber stamp, and we can invoke our authority as the ultimate fact finder to make contrary or alternative findings and conclusions "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record...." Reed , 271 S.W.3d at 727. This authority extends, when necessary, to making findings contrary of the habeas court-despite the fact that a finding may be based on credibility. Id. at 727. "[F]actors other than demeanor and inflection go into the decision whether to believe a witness." Anderson v. Bessemer City , 470 U.S. 564, 575 [105 S.Ct. 1504, 84 L.Ed.2d 518] (1985). For example, "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Id.
431 S.W.3d 67, 70-71 (Tex. Crim. App. 2014). The objective evidence here consists of the plea negotiation documents which provided, in Long's case [and those in Pitts and Shelton's cases were similar] that,
6.... Should the trial court not approve the plea bargain, and thereby reject the plea bargain agreement as to that aspect thereof, Defendant may withdraw his plea of guilty and enter a plea of not guilty, nolo contendere or guilty, and request that a jury assess his punishment. The State thereafter may pursue *639 prosecution of Defendant for [ ] any offense related to Sexual Assault, but not Capital Murder, which will be barred by the prior dismissal.
This indicated to the prosecutor, Mike Freeman that "we couldn't pursue him for anything other than sexual assault if he had withdrawn his plea" and, to Freeman's recollection, the plea negotiations as to all three of the co-defendants were the same.[27]
The credibility of the three men has been at issue since the very beginning, but the fact-finders (both Kussmaul's jury and, until 2014, Judge Allen, who presided over Kussmaul's trial and accepted and sentenced Long, Pitts, and Shelton on their pleas) were willing to overlook all the discrepancies. The prosecutor testified about this at the habeas hearing.
Q Now, specifically with respect to those items, the written statements, oral statements, the discrepancies whether minor or major, you can get into semantics about that, was that to the best of your knowledge ferreted out at trial with respect to each of these three co-defendants?
A Yes.
Q And to your knowledge was this made available to Mr. Reaves in Mr. Kussmaul's defense and those were discussed at trial or at least any discrepancies were dealt with in trial?
A He had the opportunity to do so, yes.
Q And the jury still convicted Mr. Kussmaul?
A Yes.
The record bears this out. Cross-examined at trial about the contradictions in his statements and testimony, Long testified that he made statements that were not true: "I just made a mistake. I mean a lot of things happened that night, and we was all drinking pretty heavy. And you go two years later and try to write it, and it's kind of hard to do, to remember exactly." Pitts testified at trial that he did not come clean at first because Kussmaul had threatened him, telling him if he ever said anything about the crime that he would wind up dead. Pitts acknowledged saying what he thought the detectives wanted to hear in terms of the details of the crime-regardless of whether it was true or not-but did not, in his testimony, deny his involvement in the crime. "I knew I was guilty." And Shelton testified that he did not tell "the absolute truth" the first time he was contacted because he wanted to stay out of it.
Closing arguments at Kussmaul's trial focused on whether or not Long, Pitts, and Shelton were to be believed. The prosecutor acknowledged that the State's case *640 against Kussmaul turned on jurors believing them. The prosecutor pointed to a sort of doctrine of chances, saying that "it goes beyond common sense to think that three people would get up, admit their crime which they were not connected with, which they do not do."[28] The jury apparently agreed. The jury rejected Kussmaul's theory that Long, Pitts, and Shelton testified against him to save their own skins-that they cared nothing about the truth and were not telling it. Jurors did not hear any inculpatory DNA evidence. Although Linch's testimony that it would be unlikely to recover DNA from seminal fluid with no sperm present turned out to be misleading, Linch also testified that he could not detect seminal fluid on the blanket or bed sheet the bodies were wrapped in, so the point was, as far as the jury was concerned, moot.
The jurors never heard the claims of direct coercion Applicants later made. But the claims that they were bullied and coerced were rebutted at the habeas hearing by the testimony of the lead investigator himself, the lead prosecutor, and the sole testifying defense attorney. At the time of the habeas hearing, Deputy Davis was retired after a thirty-year career at the sheriff's department. In that time, he said he had never been put on leave or written up for threatening defendants or witnesses or for coercing testimony. "There's nothing in my file." He said he never heard any complaints about his treatment of the men until they'd been in prison for a year. Davis denied that his interrogations were suggestive or coercive. Davis testified that he never mentioned the death penalty in his interrogations, nor did anyone else do so to his knowledge. Davis said he "hated to have cases when [the defense attorneys in Long, Pitts and Shelton's cases were] assigned because they were all very good."
Mike Freeman testified that all four men were represented by very good and experienced trial attorneys. "They were and still are."
Q ... during your handling of these cases, did any of these attorneys that we've discussed ever make any representations to you regarding their clients being coerced or their clients being physically harmed or anything of that nature?
A I had no complaints of that nature from anyone.
Q Had that been a complaint, would you have taken some sort of action?
A I would have. I would have looked into it, checked it out. And if I felt somebody was coercing somebody, I would have reported it to their superior.
He said there was nothing that would have stopped him from making a report.
Q And anything about your relationship (with Deputy Davis) that would have prevented you from doing what you stated earlier in your testimony, that is, taking the necessary action to investigate and report any type of coercion or forced statements or any type of physical violence?
A Absolutely not. He was just one of the deputies.
This mirrors Freeman's response to Kussmaul's claims of coercion made in his initial application, WR-28,586-02, filed in 1999. In it, Kussmaul claimed, among other things, that Long, Pitts, and Shelton's statements had been coerced. Kussmaul characterized the case against him as a *641 "holographic image." Attached to the State's response was an affidavit from Freeman, dated November 15, 1999, stating that the three accomplices "were represented by separate attorneys, none of which challenged the voluntariness of their confessions. None of the accomplices logged any complaints or testified in any regard that their confessions were any thing but voluntary."
Scott Peterson, Pitts' counsel, testified that the only coercion he was aware of came from Kussmaul. Peterson said he did not recall Pitts making any claim that the authorities forced him to confess: "I can say that had he told me that Mike Freeman had planted that in his mind, I would have remembered that."
Given the mixed evidence on whether Long, Pitts, and Shelton are credible, we cannot take the leap that Judge Allen did. We find Freeman, Davis, and Peterson's testimony at the habeas hearing credible, and Applicants' testimony about physical and mental coercion incredible. We cannot completely discredit the men's inculpatory trial testimony-especially because it is, as detailed above, corroborated by other evidence.
b. Applicants Have Not "Unquestionably Established" Their Factual Innocence
Texas' notion of actual innocence is "fact-and conduct-centric." Ex parte Fournier , 473 S.W.3d 789, 792 (Tex. Crim. App. 2015). We have held "that the term 'actual innocence' shall apply, in Texas state cases, only in circumstances in which an accused did not, in fact, commit the charged offense or any of the lesser-included offenses." State v. Wilson , 324 S.W.3d 595, 598 (Tex. Crim. App. 2010). We here add to that "or any greater offense." In this case, the three Applicants who pleaded guilty were initially subject to being charged with the greater offense of capital murder, and the fourth was tried for capital murder. The DNA evidence in this case undermines the State's sexual-assault and murder-in-the-course-of-aggravated-sexual-assault theories underlying these cases. But there is still the double murder to consider.[29] If Applicants committed the double murders-as principals or as parties-but not the sexual assault, none are actually innocent. The issue here is whether Applicants have shown by clear and convincing evidence that they did not perpetrate the crimes committed against Murphy and Neighbors, not just whether the crimes perpetrated included rape. On this record they have not.
D. Applicants Are Granted Relief on 11.073, but Not Actual Innocence Grounds
The trial court recommends relief be granted on both 11.073 and actual innocence grounds. For the reasons above, on each of the cause numbers before us, we take the first recommendation but not the second. Relief, in part, is granted. The judgments in Cause Nos. 1993-773-C (Richard Bryan Kussmaul), 1993-497-C (James Edward Long), 1993-511-C (James Wayne Pitts, Jr.), and 1993-510-C (Michael DeWayne Shelton) in the 54th District Court of McLennan County are set aside, and Applicants are remanded to the custody of the Sheriff of McLennan County to answer the charges as set out in their indictments. The trial court shall issue any necessary bench warrant within 10 days after the mandate of this Court issues.
*642 Copies of this opinion shall be sent to the Texas Department of Criminal Justice-Correctional Institutions Division and Pardons and Paroles Division.

Applicants are not in an identical posture. Kussmaul is in a different posture than Long, Pitts, and Shelton because he did not plead guilty. Shelton is in a different posture than Kussmaul, Long, and Pitts because this application is his first. Because-1) Applicants raise identical claims based on the same evidence; 2) Kussmaul, Long, and Pitts meet the subsequent writ bar; 3) the Chapter 64 hearings and the habeas hearings in these case were joint hearings; 4) all proceedings for all Applicants are in included in the record in each case; and 5) the merits of Kussmaul's claims, or lack thereof, are inextricably intertwined with the merits of the other Applicants' identical claims, or lack thereof-we consider these virtually identical applications together.

Kussmaul v. State , No. 10-94-238-CR, slip op. at 3-5 (Tex. App.-Waco Sept. 29, 1995 pet. ref'd) (not designated for publication).

Kussmaul , slip op. at 5-7.

"Krebbs" is spelled "Cribbs" in the trial record, but he signed his April 1992 statement to the Texas Rangers "Krebbs."

Kussmaul, slip op. at 5-8.

The DNA statute at the time had a "no fault" clause. It was movant's burden to show that evidence had not been previously subjected to DNA testing "through no fault of the convicted person." See Tex. Crim. Proc. Code Ann. § 64.01(b)(1)(B) (West 2001).

Kussmaul v. State , No. 10-05-00120-CR, 2006 WL 120990 (Tex.App.-Waco Jan.11, 2006, pet ref'd) (not designated for publication); Long v. State , No.10-04-00066-CR, 2005 WL 313834 (Tex.App.-Waco Feb.9, 2005, pet. ref'd) (not designated for publication); Pitts v. State , 10-05-00098-CR, 2006 WL 2507307 (Tex. App.-Waco Aug. 30, 2006, no pet.) (not designated for publication). According to the docket sheet in his case, Shelton twice filed for appointment of counsel for DNA testing. First, in 2001. That was granted. He again sought counsel for testing in 2007 and that was denied. It appears no motion was filed on Shelton's behalf until the 2012 motion.

Kussmaul , 2006 WL 120990, at *2.

Long , 2005 WL 313834, at *1.

Pitts , 2006 WL 2507307, at *3.

Leal testified, at the September 2014 Chapter 64 hearing, consistent with this finding. The finding also comports with the January 2014 Cellmark Report. But, in the June 2014 supplemental report, there is a conclusion that "no determination can be made" regarding the four Applicants "as possible contributors of the DNA" found on the "outer crotch area of the black jeans." The State does not appear to quarrel with any of the findings laying out the 2014 Y-STR results. One thing mentioned in both reports (and in Applicants' briefs), but not in the Chapter 64 hearing testimony or the findings, is that the Applicants were excluded "as possible contributors of the DNA" found in the semen on the "cutting from the crotch of the panties."

This finding is not supported by Linch's testimony at trial about hairs. Jurors heard about the existence of a "Negroid head hair on the clothing of Steven Neighbors." But the hair evidence, in general, was discounted by Linch: "I have looked at hundreds of hairs and fibers in this case up to that point ... The majority of the hairs that were collected from the clothing of the victims I could not exclude the victims as being the source. With regard to other hairs, there were some that were foreign to the victims that I could not in confidence associate to another individual."

State v. Long/Shelton/Pitts, Jr./ Kussmaul , No. 10-14-00330-CR, 2015 WL 2353017, at *1 (Tex. App.-Waco May 14, 2015) (not designated for publication).

Id. at *3.

The proper and exclusive vehicle for obtaining judicial relief from a felony conviction on the basis of a favorable finding under Article 64.04 is a post-conviction application for writ of habeas corpus returnable to this Court under Article 11.07. State v. Holloway , 360 S.W.3d 480, 488 (Tex. Crim. App. 2012), abrogated on other grounds by Whitfield v. State , 430 S.W.3d 405 (Tex. Crim. App. 2014).

Ex parte Kussmaul , WR-28,586-09, 2016 WL 3094250 (Tex. Crim. App. May 25, 2016) (not designated for publication); Ex Parte Long , WR-28,772-02, 2016 WL 1479658 (Tex. Crim. App. Apr. 13, 2016) (not designated for publication); Ex parte Pitts , WR-35,508-03, 2016 WL 1476352 (Tex. Crim. App. Apr. 13, 2016) (not designated for publication); Ex parte Shelton , WR-84,754-01, 2016 WL 1476795, at *1 (Tex. Crim. App. Apr. 13, 2016) (not designated for publication).

Shelton's response is discussed infra.

As discussed supra , Davis said that Pitts was the first to make admissions.

The State's proposed findings (filed July 22, 2016) included
171. When the known DNA evidence at the time of trial, the recantations of co-defendants, and trial counsel's failure to rebut [Linch's] testimony or present controverting expert DNA evidence are taken into consideration in a comprehensive manner, due process indicates that Kussmaul did not receive a fair trial.

Ex parte Kussmaul , WR-28,586-09, 2016 WL 8603724 (Tex. Crim. App. Nov. 9, 2016) (not designated for publication); Ex parte Long , WR-28,772-02, 2016 WL 8603723 (Tex. Crim. App. Nov. 9, 2016) (not designated for publication); Ex parte Pitts , WR-35,508-03, 2016 WL 8603722 (Tex. Crim. App. Nov. 9, 2016) (not designated for publication); Ex parte Shelton , WR-84,754-01, 2016 WL 8603713 (Tex. Crim. App. Nov. 9, 2016) (not designated for publication).

On January 22, 2016, Kussmaul's counsel filed application number WR-28,586-08, which was dismissed for non-compliance and re-filed by counsel as this application.

July 13, 2016 Article 11.07 Hr'g Tr. 3:152-53.

July 13, 2016 Article 11.07 Hr'g Tr. 3:56.

July 13, 2016 Article 11.07 Hr'g Tr. 3:194, 4:SE9 (July 20, 2000 letter from Walter Reaves to Kussmaul); Ex parte Kussmaul , WR-28,586-04, CR 51 (same); Ex parte Kussmaul , WR-28,586-05, CR 83 (State's Answer, quoting Reaves-authored pleading in Chapter 64 litigation).

July 13, 2016 Article 11.07 Hr'g Tr. 2:64.

Barbara Leal testified to this at the DNA hearing: "Well, with Y-STRs it's a more sensitive DNA testing method. It requires less DNA than, say, the DQ-alpha procedure. It's also more discriminatory. And also with mixtures, samples that have mixture, meaning more than one individual contributed, Y-STR testing you're better able to interpret those types of mixtures."

This is some evidence Long at least was not aware of this. As referenced supra , Long's attorney Russell Hunt, filed an affidavit in response to Long's initial application, WR-28,772-01. Regarding the refusal to follow the plea bargain Hunt stated,
Subsequent to learning that the Court would not follow the plea bargain, I was informed that if Mr. Long withdrew his plea of guilty, Mr. Long would be tried for either Aggravated Sexual Assault, Murder, or Capital Murder.
* * *
I explained all the foregoing to James Long in very concrete detail. It was Mr. Long's decision that he would rather be sentenced to twenty years for Sexual Assault than risk going to trial on either a First Degree Felony or a Capital offense and receiving a far greater punishment. Each of Mr. Long's codefendants reached the same conclusion. The Court rejected all of the recommendations of probation and sentenced each of the defendants to the twenty year maximum for Sexual Assault. It is my opinion that James Long saved himself a considerable amount of time by persisting in his plea. The decision to persist in the plea was made by James Long.

De La Paz v. State , 279 S.W.3d 336, 347 (Tex. Crim. App. 2009) ("The 'doctrine of chances' tells us that highly unusual events are unlikely to repeat themselves inadvertently or by happenstance.").

Kussmaul was indicted under two theories of committing Capital Murder: murder in the course of committing aggravated sexual assault and murder of more than one person in the same criminal episode. The jury charge included instructions as to both means of commission alleged in the indictment and the jury returned a general verdict.